[No. 693.]

## RICHARD BARNES, Appellant, v. JOSEPH SABRON et al., Respondents.

Water Rights—Prior Appropriation of.—A right to running-water on the public lands of the United States for purposes of irrigation, can be acquired by prior appropriation as against parties not having the government title.

Act of Congress Approved July 26, 1866, Construed.—In construing section 6 of the act of Congress approved July 26, 1866 (14 U. S. Stat. 253), recognizing the validity of the local customs, laws and the decisions of courts: *Held*, that the union of the three conditions in any particular case is not essential to the perfection of the right by priority; and in

case of conflict between a local custom and a statutory regulation, the latter, as of superior authority, must necessarily prevail.

STATUTE OF MARCH 5, 1869, CONSTRUED.—The act of March 5, 1869 (2 Comp. L. 415), applies only to cases where persons are desirous of constructing and maintaining a ditch or flume through or over the lands of another, and to provide for a right of entry upon such lands for the purpose of surveying such ditch or flume, and to declare how such lands might be condemned where the same could not be obtained by the consent of the owner.

RIGHTS OF FIRST APPROPRIATOR.—The first appropriator of the water of a stream running through the public lands has the right to insist that the water flowing therein shall, during the irrigating season, be subject to his reasonable use and enjoyment to the full extent of his original appropriation and beneficial use. To this extent his rights go, but no further; for in subordination to such rights subsequent appropriators may appropriate the remainder of the water running in said stream.

PATENTS, WHEN SUBJECT TO WATER RIGHTS PREVIOUSLY ACQUIRED.—Where a patent to land was obtained from the government subsequent to the act of Congress of 1870 (16 U. S. Stat., Sec. 17) it must, under the provisions of that act, be held subject to such vested and accrued water rights as were previously acquired by other parties under the ninth section of the act of 1866.

CONFLICTING TESTIMONY—DUTY OF DETERMINING.—The duty of determining the truth where the testimony is conflicting, belongs almost exclusively to *nisi prius* courts, and should always be exercised and determined by an impartial judgment.

WATERCOURSE, WHAT CONSTITUTES.—To maintain the right to a watercourse it must be made to appear that the water usually flows in a certain direction and by a regular channel, with banks or sides. It need not be shown to flow continually, and it may at times be dry, but it must have a well-defined and substantial existence.

POSSESSION OF LAND UNDER CULTIVATION.—Where there is no testimony showing that it is necessary to inclose the land in order to cultivate it: *Held*, that a party must be considered as in possession of all the land he actually cultivates.

IDEM—CONTRACT OF PURCHASE.—Where the party also has a contract of purchase from the State: *Held*, that he has the beneficial estate or interest as well as the possession, and as such equitable owner and actual possessor is entitled to enjoy all the incidents to the land and its ownership as well as the land itself.

REASONABLE USE OF WATER.— The first appropriator is only entitled to as much water as is necessary to irrigate his land, and is bound, under the law, to make a reasonable use of it.

IDEM.—What is a reasonable use depends upon the circumstances of each case. *Held*, under the particular facts of this case, that plaintiff should not be confined to the amount of water used by him the first and second year after his appropriation, nor his rights regulated by the number of acres he then cultivated; that the object had in view, at the time of his

diversion of the water, must be considered in connection with the actual extent of his appropriation.

IDEM—CAPACITY OF DITCHES. — Where the prior appropriator of a stream has constructed ditches in order to irrigate his land: *Held*, that if the capacity of his ditches is greater than is necessary to irrigate his farming-land, he must be restricted to the quantity needed for the purposes of irrigation, for watering his stock and for domestic purposes; but if the capacity of his ditches is not more than sufficient for those purposes, then, under the facts of this case, no change having been made in the ditches since constructed, and no question of the right of enlargement being involved, he must be restricted to the capacity of his ditches at their smallest point.

APPROPRIATION FOR PARTICULAR PERIOD OF TIME.—If the first appropriator only appropriates a part of the waters of a stream for a certain period of time, any other person may not only appropriate a part or the whole of the residue and acquire a right thereto as perfect as the first appropriator, but may also acquire a right to the quantity of water used by the first appropriator at such times as not needed or used by him.

DAMAGES—WHAT REGARDED IN ASSESSING.—It is the immediate consequences of the injurious acts that must be regarded in assessing damages, and even where defendants are to some extent in fault, they have the right to show that the injury of which plaintiff complained was the immediate result of his own negligence, and was not in any manner attributable to any act of theirs.

EQUITABLE RELIEF WHERE RIGHTS ARE VIOLATED.—Where there is a clear violation of a right, and equitable relief is prayed for, it is not necessary to show actual damage; every violation of a right imports damage, and this principle is applied whenever the act done is of such a nature as that by its repetition or continuance it may become the foundation of an adverse right.

FINDINGS—How CONSTRUED. — The findings of fact by the court are like a special verdict of a jury, and must be taken in connection with the pleadings to support the judgment; they cannot be detached from each other, but must be read together for the purpose of ascertaining their meaning, and if there is any conflict or discrepancy between general and specific findings, the specific findings must control.

MOTION FOR NEW TRIAL—FINDINGS AGAINST LAW. — Where a party applies for a new trial upon the ground of insufficiency of the evidence to justify the findings of the court, and that the findings are against law: *Held*, that the district court is authorized to decide whether the findings sustained the judgment, and that its action in regard thereto can be reviewed by this Court on an appeal from the order overruling the motion for a new trial.

APPEAL from the District Court of the Fifth Judicial District, Nye County.

This was an action to recover damages for the diversion

of water, brought by plaintiff against the defendants, Joseph Sabron, Alexander McCullough, David H. Lemmon, Joseph Travis, Samuel Kain, E. Shelby, Anna Whithall and Walter Whithall.

The material allegations of the complaint are, that plaintiff is the owner in fee simple of six hundred acres of land (describing it); that said land is agricultural and will produce good crops of grain and vegetables with water, but without water will produce no crops; that the water of Currant Creek — a natural watercourse and surface stream — from time immemorial has flowed, and, when unobstructed and not diverted, now flows in the natural channel of said stream into, through and upon said land, and thereby moistens, irrigates and benefits the same and the crops of grain and vegetables growing thereon, and supplies said plaintiff with water for his stock and for domestic purposes, and for the irrigation of his land and the crops growing thereon; that there is no other source except said stream from which plaintiff can obtain water for the purposes aforesaid; that plaintiff and his grantors were the first locators of land on said stream, and the first to appropriate the waters thereof and to put the same to a useful and beneficial purpose; that on the 16th of September, 1868, plaintiff and his grantors appropriated all the water flowing in the natural channel of said stream for the purposes above mentioned, and ever since, except when prevented by the wrongful and unlawful diversion of said defendants, have used the water for the irrigation of said land and crops growing thereon, etc.; that during the months of May, June, July and August, 1873, plaintiff had a large crop of grain and vegetables growing on said laid; that defendants during said months wrongfully and unlawfully diverted the water flowing in said stream, and turned the same out of its natural and usual channel and obstructed and retarded its flow and prevented it from flowing into, through and upon said land as it was accustomed to do; that by reason of said wrongful and unlawful acts plaintiff, during the months aforesaid, was deprived of sufficient water to irrigate said lands, etc.,

and during the last two of said months he was deprived of all the water of said stream for any purpose whatever; that by reason of the wrongful and unlawful acts of defendants plaintiff has been injured and damaged in his crop of grain to the extent of forty-two tons of the value of sixty gold coin dollars per ton; that said defendants and each of them now threaten to continue, and unless enjoined will continue, wrongfully and unlawfully to divert and obstruct the water of said stream permanently away from the natural channel thereof, and are and have been, and unless enjoined will continue to prevent the same from flowing into, through and upon said land, and are and have been depriving plaintiff of the use of said water for the purposes aforesaid to the injury and damage of said plaintiff's right, and to the injury and damage of his land and crops as aforesaid in the sum of two thousand five hundred and twenty dollars. Plaintiff prays for a restraining order against defendants; that plaintiff be decreed a usufruct in all the water of said stream; that he have judgment for the sum of two thousand five hundred and twenty dollars for his costs and for such other and further relief as may seem just and equitable.

The defendants filed separate answers, denying specifically each and every allegation in said complaint contained. For further answer, each of the defendants set up their title to certain lands on the banks and bed of the stream. Defendant Sabron avers that his land is situated below the upper sink of Currant Creek; that Currant Creek rises again to the surface east of the eastern line of his land, and flows thence in and upon his land; that said Currant Creek again sinks before it leaves his land. For further answer, defendant Sabron avers that he and his grantors were the first appropriators of the waters of Currant Creek below the upper sink thereof, and the first to subject the same to useful and beneficial purposes; that irrigation is indispensable to the cultivation of his land; that by reason of his right of ownership in the soil, embracing both banks and the bed of that portion of the stream which flows and runs in and upon

his lands, he is entitled to the reasonable use of the waters thereof for purposes of irrigation, for his stock and for domestic purposes; that he has not at any time when using the water of that portion of the stream below the upper and above the lower sink thereof, permitted the same or any portion thereof to run to waste, nor improvidently or wastefully used the waters of said stream, so as to materially or appreciably affect the rights of said plaintiff or those living upon any portion of said stream below him; that the only water at any time appropriated by said plaintiff or his grantors were the waters of certain springs having their rise upon the land formerly owned by Jacob Slaght, and now claimed by plaintiff, and that said springs are situated below the lower sink of Currant Creek. Similar averments are contained in the answers filed by the other defendants.

The facts are sufficiently stated in the opinion.


*Robert M. Clarke,* for Appellant.

I. It is not necessary that a stream should flow continuously to constitute it a natural watercourse, or to entitle the plaintiff to the rights of an appropriator or riparian owner in the waters. (Angell on Watercourses, 6th ed. Sec. 4; *Shields* v. *Arndt,* 3 Greene Ch. 246; *Barret* v. *Salsbury Manufacturing Company,* 43 N. H. 578; *Luther* v. *Winnisimmet Co.,* 9 Cush. 174.)

II. There is no aspect in which this case can be viewed that will not entitle the plaintiff to a decree. Should the court adopt *appropriation* as the law to govern the case, and measure the rights of the parties and extent of appropriation by the size of their ditches, the plaintiff must in that instance recover, because his ditches were first, and were sufficiently large to carry all the water he required in 1873, and because the defendants deprived him of the water which his ditches would carry. If the court measure the rights of the parties by the actual use of the water, the plaintiff must in that case recover, because he cultivated more land, and consequently used more water, than all the defendants in 1869 and

1870, and nearly as much as all of them in 1871, when, according to the proofs, there was plenty of water for all. If the plaintiff is to be limited to the water actually used by him in 1869, if he is to be denied the privilege accorded to the defendants of increasing his cultivated land and use of water from year to year as his necessities required, still he must recover something in this suit, because it is indisputable that he and his grantors used more water on the land he now owns, in 1869, than was permitted to reach him in 1873. If the court should divide the water in proportion to the acres cultivated by each in 1869 or 1870, plaintiff would get more than one-half the stream; if in proportion to the acres cultivated in 1871, plaintiff would get nearly one-half. If in proportion to the acres cultivated by each in 1873, and nothing could be more unfair to plaintiff than this, still the plaintiff would get about one-third of all the water flowing in the stream. If the court should give plaintiff the water unappropriated by the defendants and actually used by plaintiff in 1871, he will then have sufficient to irrigate his land; or if plaintiff gets water enough to irrigate as much land as the defendants added to their cultivated land since 1871, he will have as much as he required in 1873. If appropriation is to be rejected and the law of riparian proprietorship is to prevail, then the plaintiff, being connected with the fee by his contract with the State, and his lands being situated on both sides of the stream, is entitled to have the water of Currant Creek flow to and through his land at such times and in such quantities as are necessary to satisfy all his beneficial uses and actual wants.

III. The plaintiff was entitled to a decree upon the facts found. Whatever these rights, whether great or small, he is entitled to have them determined in the suit and settled by the decree. This action is not at law to recover damages, but in equity to determine rights to the use of water and to enjoin threatened diversion. The answers deny appellant's right to any of the water of Currant Creek, and affirm the right to be in defendants. It is very plain that plaintiff

was entitled to some water; this at least he was entitled to have decreed to him, and to have defendants enjoined from interfering with. But no rights at all are decreed to plaintiff; on the contrary, he is adjudged to pay the costs.

*Hillhouse & Davenport,* for Respondents.

I. The notice of the intention to move for a new trial is the basis upon which this whole proceeding stands. The appellant appeals from the order overruling the motion for new trial, and also from the judgment. On the appeal from the order, the statement and assignments of error constitute the statement on appeal; that is, so far only as this Court can review the' action of the lower court in refusing to grant a new trial. In other words, the statement on motion for a new trial being only for the purpose of raising questions on that motion—questions upon the grounds stated in section 195, upon which new trials may be granted —can only be considered as a statement, so far as it is necessary to enable this Court to pass upon the correctness of the rulings of the court below in passing upon that motion; that is, no question can be raised in this Court on such a statement, except such as relate to the grounds upon which a new trial may be granted. On the appeal from the judgment there is no statement; no specific or any statement of the particular or any errors upon which the appellant will rely, as required in section 332 of the Practice Act; then we contend that there are no questions of any kind raised on this appeal, except such as are raised properly on motion for new trial. "A new trial is a re-examination of an issue of fact." For the purpose of procuring such re-examination, certain grounds are specified in our Practice Act, upon which new trials may be had. We maintain that the only question raised upon this appeal is, Is the evidence sufficient to sustain the findings? The other questions sought to be raised could only be brought up in this Court on statement on appeal, with specific statement of the grounds upon which appellant would rely; and appellant has failed to furnish such statement or specification on this appeal.

II. Upon the question, whether the evidence is sufficient to support the findings, we invoke the very general and well-understood rule that, if there is any evidence to support the findings, or any material one of them of the lower court, the appellate court will not interfere. If Currant Creek is not a living stream of water, or if the water thereof would sink before reaching plaintiff's ranch; or, if plaintiff, at all times, had as much water as he first appropriated, and beneficially used, or as much as he needed; or if the spring on plaintiff's ranch supplied him with all he had ever appropriated or beneficially used or needed; or if plaintiff permitted water to pass him when his crops needed it, then the judgment and order appealed from must be affirmed. If either one of these findings are supported at all by evidence, the court below could not do otherwise than it did.

III. The size of Barnes's ditches is not the criterion to determine whether or not plaintiff had at all times as much water as he had first appropriated and beneficially used. The turning of water is not sufficient; the user must accompany that before any right accrued. How much water did Barnes first appropriate and beneficially use? The findings are silent on this; and no motion having been made in the court below to have the findings on that point corrected, there is no way now to review that question. Where an action is tried by the court, the law points out the manner in which defective findings will be reviewed; and counsel have not followed that course.

IV. It is admitted that Barnes permitted the water to run past him. A court of equity will not compel the defendants to allow the water to flow down to Barnes if he may let it go on to whom he pleases, or may make use of it or not as suits his convenience or caprice. The whole doctrine of prior appropriation and beneficial uses is, that there must be some useful purpose for which a party uses the water before any right can accrue. Courts do not require water to run to one's ranch simply because he claims it, or that he may be generous and pass it on to some one below, who, so far as we know, may have had no right

whatever. If Barnes "contributed to his own damage," then, of course, these defendants cannot be mulcted in damages or costs. He cannot come into a court of equity and say, you have done me irreparable injury, and threaten to continue it, when from this very evidence he shows that he did use what water was carried to him through ditches around the sink.

V. In all cases where the title to land passed from the government prior to the act of Congress of 1866, the common law doctrine, as decided in *Van Sickle* v. *Haines*, prevails. In cases where the title to the land remains in the government, or has passed from it since that act, the rule of "prior appropriation with beneficial uses." The act of Congress recognizes the law as settled by the decisions of local courts, etc. Our Supreme Court, in various cases prior to that act, and since, has followed the rule of decision of the California courts—that of prior appropriation and beneficial uses.

VI. Courts of equity do not permit parties to claim its aid where no damage has been done, and none threatened. We therefore claim that no decree, under any circumstances, could, on the evidence, have been entered for plaintiff; at any rate, not since the court had made its findings in favor of defendants on the evidence.

VII. The appellant did not prove himself the owner or in possession of the land, except as to fifteen acres—the amount inclosed by a fence. We submit that in order to maintain an action for the diversion of water from land, a party must have such title or possession of the land as would enable him to maintain an action of ejectment if ousted, or trespass against one entering thereon. No contract with the State can give a title that will maintain either of those actions; and hence, will not maintain this one. No possession of the land outside of the fifteen acres is proven, except that part of it had been cultivated.

In California, contracts of purchase with the State have been held admissible in evidence; but upon examination of those cases it will be found that they were made admis-

sible by legislative enactment; and we have none. We
refer to the following authorities on what constitutes actual
possession: 1 Nevada, 68; 2 Nevada, 280; 9 Nevada, 20.

*T. W. W. Davies*, also for Respondents.

I. As there is no attempt at specifying in what respect or
on what ground the judgment is against law, this Court can
consider only whether the findings are supported by the
evidence. (*Mahoney* v. *Van Winkle*, 21 Cal. 552; *Wall* v.
*Preston*, 25 Cal. 59; *Millard* v. *Hathaway*, 27 Cal. 119;
*Barstow* v. *Neuman*, 34 Cal. 90; *People* v. *Richmond*, 29 Cal.
414.)

II. The findings on all material points, sufficient to sus-
tain the judgment, are amply supported by the testimony.

III. Where the evidence is conflicting, neither the ver-
dict of a jury nor the findings of the court will be disturbed.
(*Lubeck* v. *Bullock*, 24 Cal. 338; *Rice* v. *Cunningham*, 29
Cal. 492; *Wilkinson* v. *Parrott*, 32 Cal. 102; *McNeil* v. *Shir-
ley*, 33 Cal. 202.) The granting or refusing of a motion for
new trial is in the discretion of the court below; and the
appellate court can only interfere in cases of plain abuse
of such discretion. The lower courts have an enlarged
discretion in the conduct of their business, and questions of
discretion are not reviewed except in cases of *gross abuse*.

By the Court, HAWLEY, C. J.:

This action was brought by plaintiff to recover damages
from defendants for the alleged unlawful diversion of water
during the months of May, June, July and August, in the
year 1873; to enjoin further diversion and to obtain a decree
declaring plaintiff to be entitled to the use of all the waters
of Currant Creek.

The cause was tried before the court without a jury, and
judgment was rendered in favor of defendants for costs.

Plaintiff appeals from the judgment and from the order of
the court overruling plaintiff's motion for a new trial.

The case comes up for review upon the "statement on

motion for new trial," and the appeal is based upon the grounds that the findings are contrary to the evidence and that the judgment is not supported by the findings. It appears from the testimony that plaintiff and defendants are owners of respective ranches, or farms, situate upon the stream known as Currant Creek, in Nye County; that defendant Sabron has title in fee to the land; his patent was issued by the State of Nevada, in January, 1874; that plaintiff has a contract for a deed from the State dated May 15, 1873, said contract being drawn in pursuance of section 9 of the act entitled "An act to provide for the selection and sale of lands that have been or may hereafter be granted by the United States to the State of Nevada," approved March 5, 1873 (Stat. 1873, 120); that the other defendants have only a possessory title to their land; that all the land is agricultural and requires water for irrigation to make it productive; that plaintiff owns two ranches; the lower one was located by him in September, 1868, and the upper one, designated as the "Slaght ranch," was located in January, 1869; that defendants' ranches are located on Currant Creek, above the land of plaintiff; that Sabron's land was located in November, 1868, Lemmon's in December, 1868, and the other defendants are all subsequent in date to the Slaght ranch; that as early as the 6th day of January, 1869, a ditch was constructed on plaintiff's lower ranch, which, he testifies, "was sixteen inches deep by thirty-six inches wide," of sufficient capacity to carry, according to the testimony of the witness Rock, four hundred and thirty inches of water, and diverted water from the creek through and upon plaintiff's land, for irrigating purposes; that in February, 1869, plaintiff dug another ditch upon another portion of his land, for the same purpose, which, he testifies, "was three feet wide and sixteen to twenty inches deep," and further testifies that no change has been made in either of these ditches since they were constructed, and that he has always used the same and had water running therein, during the summer seasons, to irrigate his land; that these were the first ditches

through which water was diverted from the channel of Currant Creek; that there is a conflict in the testimony as to the capacity of these ditches, the testimony introduced by defendants tending to show that these ditches were not more than twelve inches wide and two or three inches deep; that in April, 1869, defendant Lemmon constructed two ditches, one on the north, the other on the south side of the creek, diverting water from a creek that heads about eighty rods above the head of his ditches, and from springs; that by means of his ditches he has about three hundred and fifty inches of water; that about the fifteenth of April, 1869, a ditch was commenced, on defendant McCullough's land, of sufficient capacity to carry two hundred inches of water; that in May, 1869, there was a ditch constructed which diverted the water from the creek, upon and through the land of Sabron, that was two feet wide, spade deep, and of sufficient capacity to carry two hundred inches of water; that in April, 1870, on the upper end of Sabron's land, there was a ditch constructed three feet wide and twenty inches deep —for one hundred yards—capable of carrying all the waters of Currant Creek; that in May, 1869, there was a ditch on the Slaght ranch which, plaintiff testifies, was at its mouth two by three feet, and that its depth, for forty yards, was about two feet; that the Slaght ranch was irrigated by this ditch from the Slaght springs, which are in the bed of the creek on this ranch, and which, Slaght testifies, "are a drainage of water from above;" that the quantity of water flowing from these springs is variously estimated at from twenty-five to one hundred and fifty inches; that plaintiff cultivated in 1869—according to his own testimony—about twenty-five acres of land on his lower ranch, in 1870 sixty acres, in 1871 sixty-five acres, in 1872 sixty-seven and one-half acres, and in 1873 seventy-five acres; that there were cultivated in 1869, on the Slaght ranch, about seven acres, in 1870 forty acres, in 1871 eighty acres, and in 1873 fifty acres; that on Sabron's land, in 1869, there were cultivated about three and one-half acres, in 1870 thirty-five acres, in 1871 sixty-five acres, and in 1873 one hundred

acres; that Lemmon cultivated, on his land, in 1869, eighteen acres, in 1870 forty acres, in 1871 fifty-five acres, in 1872 seventy-five acres, and in 1873 about ninety acres; that in 1869 McCullough cultivated about four acres; that the other defendants commenced cultivating and irrigating their lands after the year 1869; that in 1873 there were about one hundred more acres of land cultivated than in any previous year; that plaintiff testifies that in 1869 he used one hundred inches of water, in 1870 from two hundred to three hundred inches, and that he needed, in 1873, from three hundred to three hundred and fifty inches of water; that the defendants introduced testimony tending to show that plaintiff, in 1869, only cultivated, on his lower ranch, from twelve to thirteen acres, and only used from fifteen to eighteen inches of water, and that on the Slaght ranch only water enough was used to irrigate the land under cultivation, amounting to eighteen or twenty inches; that the amount of water required to irrigate the crops of grain and vegetables on the land is estimated at from one to two inches per acre, constant use; that the irrigating season commences about the first of May and ends about the last of August; that plaintiff's crops of grain and vegetables suffered for want of sufficient irrigation in 1873.

These facts we glean from the record, independent of the pretended findings of facts in the court below.

Without drifting, along with counsel, upon the sea of uncertainty as to the law, it becomes necessary, before reviewing the findings, to determine the legal principles that must be considered in connection with the facts of this case. The question whether a right to running waters on the public lands of the United States for purposes of irrigation can be acquired by prior appropriation, as against parties not having the title of the government, has recently been decided in the affirmative in the case of *Basey* v. *Gallagher,* in the Supreme Court of the United States. Justice Field, in delivering the opinion of the court, said: "In the late case of *Atchison* v. *Peterson* (20 Wall. 507) we had occasion to consider the respective rights of miners to running waters on

the mineral lands of the public domain; and we there held that by the custom which had obtained among miners in the Pacific States and Territories, the party who first subjected the water to use, or took the necessary steps for that purpose, was regarded, except as against the government, as the source of title in all controversies respecting it; that the doctrines of the common law declaratory of the rights of riparian proprietors were inapplicable, or applicable only to a limited extent, to the necessities of miners, and were inadequate to their protection; that the equality of right recognized by that law among all the proprietors upon the same stream would have been incompatible with any extended diversion of the water by one proprietor, and its conveyance for mining purposes to points from which it could not be restored to the stream; that the government by its silent acquiescence had assented to and encouraged the occupation of the public lands for mining, and that he who first connected his labor with property thus situated and open to general exploration did, in natural justice, acquire a better right to its use and enjoyment than others who had not given such labor; that the miners on the public lands throughout the Pacific States and Territories, by their customs, usages, and regulations, had recognized the inherent justice of this principle, and the principle itself was, at an early period, recognized by legislation and enforced by the courts in those States and Territories, and was finally approved by the legislation of Congress in 1866. The views there expressed and the rulings made are equally applicable to the use of water on the public lands for purposes of irrigation. No distinction is made in those States and Territories by the custom of miners or settlers, or by the courts, in the rights of the first appropriator from the use made of the water, if the use be a beneficial one." (20 Wall. 670.)

The act of Congress approved July 26, 1866, provides: "That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are

recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same." (14 Stat. U. S., Sec. 9, 253.)

In *Basey* v. *Gallagher*, it was decided that it was "very evident that Congress intended, although the language used is not happy, to recognize as valid the customary law with respect to the use of the water which had grown up among the occupants of the public land under the peculiar necessities of their condition; and that law may be shown by evidence of the local customs, or by the legislation of the State or Territory, or the decisions of the courts. The union of the three conditions in any particular case is not essential to the perfection of the right by priority; and in case of conflict between a local custom and a statutory regulation, the latter, as of superior authority, must necessarily control."

This act of Congress was in force when plaintiff and defendants acquired their respective rights to the waters of Currant Creek. No testimony was offered, on the trial of this case, by either party as to the existence of any local custom, nor is there any statute of this State which recognizes the right of prior appropriation of water for the purposes of irrigation. The act entitled "An act to allow any person or persons to divert the waters of any river or stream, and run the same through any ditch or flume, and to provide for the right of way through the lands of others," approved March 3, 1866, and amended March 5, 1869 (2 Comp. L. 415), is not, in our judgment, applicable to this case. It was intended to apply to cases where persons were desirous of constructing and maintaining a ditch or flume through or over the lands of another, and to provide for a right of entry upon such lands for the purpose of surveying such ditch or flume, and to declare how such lands might be condemned where the same could not be obtained by the consent of the owner. There is no declaration that upon compliance with any of its provisions any right of priority will be secured, and the fact that neither plaintiff

nor defendants conformed to the requirements of this law does not in any manner affect their rights in this action.

The doctrine that the first appropriator has the superior right, "where the right to the use of running water is based upon appropriation, and not upon an ownership in the soil," has been recognized and acknowledged by the decisions of this Court in *Lobdell* v. *Simpson* (2 Nev. 274), and the *Ophir S. M. Co.* v. *Carpenter et al.* (4 Nev. 534).

The facts of this case do not call in question the correctness of the decision in *Van Sickle* v. *Haines* (7 Nev. 249), where the title to the land had been obtained from the government prior to the acts of Congress herein referred to.

It logically follows from the legal principles we have announced that the plaintiff, as the first appropriator of the waters of Currant Creek, has the right to insist that the water flowing therein shall, during the irrigating season, be subject to his reasonable use and enjoyment to the full extent of his original appropriation and beneficial use. To this extent his rights go, but no further; for in subordination to such rights the defendants, in the order and to the extent of their original appropriation and use, had the unquestionable right to appropriate the remainder of the water running in said stream. (*The Butte Canal and Ditch Co.* v. *Vaughn*, 11 Cal. 143; *The Nevada Water Co.* v. *Powell et al.*, 34 Cal. 109.)

In 1870 Congress amended the act of 1866, and provided: "That none of the rights conferred by sections five, eight and nine of the act to which this act is amendatory shall be abrogated by this act, and the same are hereby extended to all public lands affected by this act; and all patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued water-rights, or rights to ditches and reservoirs used in connection with such water-rights, as may have been acquired under or recognized by the ninth section of the act of which this act is amendatory." (16 U. S. Stat. 218, Sec. 17.) The certificate of plaintiff from the State and the patent of Sabron must, under the provisions of this law, be held subject to such

vested and accrued water-rights as were acquired by the respective parties under the ninth section of the act of 1866. The findings of fact, in the court below (here numbered for convenient reference), are as follows:

1. "That Currant Creek is not a living surface stream of water, continuously flowing; but that the same is supplied at certain seasons of the year from the snows on the mountains above the valley and from springs having their rise and flow along the banks and bed of the same; that the channel of the same has been formed from the high freshets produced by the melting snow on the mountains."

2. "That the waters derived from the springs along the banks of said stream would not reach the premises of the plaintiff if the same were to remain unobstructed and uninterrupted; that the waters of the springs along the banks and bed formed by the freshets in the spring of the year sink and entirely lose themselves in the sand, gravel and debris, deposited in the bed formed as above stated; that said waters sink and disappear beneath the surface of the earth; that there is no evidence to establish the fact of the existence of a subterranean vein or channel of water; that the rise of water in the bed formed as above, is from the percolating water in the earth beneath its surface."

3. "That the plaintiff at all times has had the uninterrupted enjoyment of all the water first appropriated and beneficially used by him; that the amount of water first appropriated and beneficially used by him is continuously supplied to him from the springs rising upon the lands of plaintiff, formerly known as the Slaght ranch, and below the premises of either of these defendants."

4. "That at the instance and request of this plaintiff the defendants permitted him the use of water above the last-named springs, to flow to plaintiff's premises, (and that) it was necessary to confine and flow the same through the ditch of defendant Sabron, in order that the water might connect with the waters of the springs on the Slaght ranch."

5. "That if all the water above the Slaght ranch had been turned into the bed formed as hereinbefore stated,

that the same would have sunk and disappeared before forming a connection with the waters of the springs on the Slaght ranch, and thereby have proved fruitless and of no avail to said plaintiff."

6. "That the plaintiff, at the time he needed the use of the water upon his crops of grain and vegetables, by his own acts permitted the water which had been turned down to him by defendants, from above, through their ditches, to flow past his premises, for the use and benefit of other parties below him, thereby contributing to his damage."

7. "That by no act or acts of these defendants, or either of them, has this plaintiff sustained damage in any amount whatever."

The court finds as matters of law: "That the plaintiff is not entitled to recover, and that he take nothing by reason of his suit; that defendants are entitled to recover of said plaintiff their costs in this behalf expended; that no injunction either temporary or perpetual issue against said defendants, or either of them, their agents or employees."

The duty devolved upon courts, of determining the truth where the testimony is conflicting, is always unpleasant, and often difficult. It belongs almost exclusively to our *nisi prius* courts, and should always be exercised and determined by an impartial judgment. It is, indeed, almost impossible for an appellate court to ever satisfy itself upon such questions, so much really depends upon the manner, bearing, character of witnesses, and the peculiar circumstances of each case, which the transcript fails to preserve, and which always give value and weight to testimony. Hence it is that appellate courts are seldom, if ever, inclined to disturb the findings of the court below, where there is a substantial conflict in the evidence, if sufficient appears in the record to support the findings. Where there is a conflict, the question is often presented as to which of the witnesses—apparently of equal credit—had the best opportunity to ascertain, or which was most likely, on account of his interest, position, circumstances or surroundings, to remember the facts. Again, it does not necessarily follow

that because there is a conflict in the testimony, that one or the other of the witnesses have testified falsely, and that the court must take the whole statement of one and reject the entire testimony of the other. It is the duty of all courts first to ascertain whether, or not, the testimony can be harmonized upon any given state of facts, before any part thereof is rejected. With these rules in view we have examined the testimony to ascertain whether the "findings" are supported by the evidence.

It appears from the testimony that Currant Creek is partly supplied at certain seasons of the year from springs having their rise and flow along its banks and bed, but mostly from the melting snow on the mountains. There is no regularity as to the quantity of water, for, to quote the language of several of the witnesses, "no two seasons are alike," the amount of water flowing being dependent upon the character of weather during the preceding winter. After a cold winter, when deep snows have fallen, the water flows in greater quantity and for a longer time than after an open winter with but little snow; hence the amount of water varies in the summer season—according to statements made by different witnesses—from nothing to five thousand inches. There is a conflict of evidence as to the real character of this stream; the conflict, however, is principally confined to the question, whether the water therein "continuously flows." The fact that should have been found by the court below was, whether or not Currant Creek was a natural watercourse and surface stream. To ascertain that fact it was not necessary to determine whether the water was *continuously flowing*.

"A watercourse," says Angell, "consists of bed, banks and water; yet the water need not flow continually, and there are many watercourses which are sometimes dry. There is, however, a distinction to be taken in law between a regular flowing stream of water, which at certain seasons is dried up, and those occasional bursts of water which, in times of freshets or melting of ice and snow, descend from the hills and inundate the country." (Angell on Water-

courses, Sec. 4.) This distinction was entirely ignored by the court below. We are of opinion that the testimony clearly shows that Currant Creek belongs to the first class referred to by Angell; that it is a "flowing stream of water," a watercourse as distinguished from water flowing through hollows, gulches or ravines only in times of rain or melting snow. The finding "that the same is supplied at certain seasons of the year from the snows on the mountains above the valley, and from springs having their rise and flow along the banks and bed of the same" (being sustained by the evidence), gives to this creek the character of a natural watercourse, in so far as finding one is involved. It is well settled that in order "to maintain the right to a watercourse or brook, it must be made to appear that the water usually flows in a certain direction and by a regular channel, with banks or sides. It need not be shown to *flow continually*, * * * and it may at times be dry, but it must have a well-defined and substantial existence." (Angell, *supra*.)

Findings two and five will be considered together. They are, in our judgment, without substantial support in the testimony. It is true that at certain places on the creek, at certain seasons of the year, the waters from the springs flowing in said stream "did sink and disappear beneath the surface of the earth," but in nearly every instance it is shown either that it occurred when defendants were diverting all, or nearly all, of the waters from the creek, or that the water after sinking beneath the surface appeared within a very short distance in the bed of the stream. It appears from the testimony that at a certain point on the creek where it flows through the land of defendant Sabron, the water flowing in the natural channel from above loses its force, the bed of the stream rises, causing the water to spread out and run in different channels; as the soil is sandy a portion of the water is absorbed and the quantity flowing in the creek below is considerably reduced. In support of these findings defendants introduced considerable testimony, a portion of which we quote. Lemmon testifies

that about three miles above the narrows there are some
springs that afford about twenty inches of water, which run
a short distance and sink; above them it is dry, during dry
seasons, for one mile above Kain's house. Holloway testi-
fies that "in the forepart of August, 1872, about two hun-
dred yards above Travis's house the water sunk; * * *
a short distance below Travis's house, about fifty yards, the
water appeared again in the bed of the stream." Boyd
testifies that in 1870, upon Sabron's ranch, after water was
turned into the creek it did not get to plaintiff's ranch until
the next year; but he says that in June and July, 1870, after
irrigating land on Sabron's ranch for two days, the water
was turned off and that it found its way into the channel
and run down to Slaght's ranch. English testifies that "if
the water should flow unobstructed from Whitehall's place
to the Slaght place, a great deal of it would sink all the way
down." He also testifies that he knew a place on Sabron's
land, between those two places, where the water sinks, for he
had "seen it dry for several months in succession;" yet he
adds that "in irrigating season, the water, if turned into
the natural channel and not obstructed, might run over the
bar at Sabron's place. I have seen it run over the bar
plenty of times. * * * I saw water running over the
bar last year (1873) in the summer months. * * * I saw
water running on the bar in May and June, 1873." Dennet
testifies that in June, 1869, at the point where the water
spread out, it did not reach Sabron's ranch at the lower end.
We have quoted the most favorable testimony for defend-
ants, and it, in our judgment, fails to sustain the findings.
When all the testimony bearing upon these findings has
been sifted from the rubbish found in the record and closely
scrutinized, we think the truth is that when the defendants
were diverting all the water in the summer season the bed
and bar become dry, and if either one of the defendants
turned the water down without the co-operation of the
others, but a small proportion, if any, of the water thus
turned down into the natural channel would ever reach the
premises of plaintiff; but if the water was all turned down

and allowed to flow in the natural channel without interruption, it would run over the bar and reach plaintiff's land, although its quantity might be reduced; the amount lost being to some extent dependent on the amount flowing in the creek—the greater the amount the lesser the proportion reduced.

Plaintiff's appropriation, when made, applied to the then condition of the stream. At that time and for several years afterwards sufficient water flowed down to plaintiff's premises to irrigate his land independent of the water flowing from the Slaght springs. This was the condition of the creek until defendants commenced using all, or nearly all, the waters from above to irrigate their lands. The fact that their use of the water has caused the channel to dry up, is no excuse for depriving plaintiff of the amount of water to which he is entitled by virtue of his prior appropriation. All the defendants procure water from the surface, either from the creek or from springs, and no facts are presented which call in question the legal rights of any of the parties to percolating waters beneath the surface of the earth.

The first clause of finding three is a conclusion dependent upon facts not found by the court. How much water was plaintiff entitled to as the first appropriator? Upon this important question the finding is silent; yet the court says "that plaintiff at all times has had the uninterrupted enjoyment of all the water first appropriated by him," and evidently bases this part of the finding upon the latter clause, "that the amount of water first appropriated and beneficially used by him, is continually supplied to him from the springs rising upon the lands of plaintiff, formerly known as the Slaght ranch, and below the premises of either of these defendants." How much water is supplied to plaintiff from these springs? No answer to this question can be found by examining the findings. It is questionable whether such a conclusion based upon such an uncertainty rises to the dignity of a finding of fact worthy of review. From the phraseology of the last clause it may be that the court was of the opinion that plaintiff should be limited in his rights

to the amount of water actually used by him in the first year of his appropriation. The words "first appropriated and beneficially used " are susceptible of that construction. The plaintiff's rights to the water are not, however, dependent upon the amount beneficially used by him in the first year of his appropriation, as will more fully appear in our review of other findings; hence this view of the case cannot be sustained.

The position contended for by respondents' counsel, that this finding could be sustained upon the ground that plaintiff had failed to produce any title or prove actual possession to more than fifteen acres of land, that being the amount inclosed by a substantial fence, and that he was only entitled to sufficient water to irrigate that number of acres, is equally untenable. From an examination of the record it is manifest that no such question was presented or considered in the lower court, and it is doubtful whether from the facts of this case we are called upon to consider it. The objection will, however, be briefly noticed. From the testimony it clearly appears that plaintiff cultivated at least one hundred and twenty-five acres on his two ranches. There is no testimony showing that it was necessary to inclose the land in order to cultivate it. The plaintiff must be considered as in possession of all the land actually under cultivation. In addition to plaintiff's proof of actual possession, he introduced without objection a contract of purchase from the State of Nevada for the lower ranch (three hundred and twenty acres). To this land he has the beneficial estate or interest, as well as the possession, and as such equitable owner and actual possessor is entitled to enjoy all the incidents to the land and its ownership, as well as the land itself. In our judgment, he is entitled to the use of the waters of said creek for the purpose of irrigating the land under cultivation, as well as for his stock and domestic purposes.

Finding four is, to some extent, sustained by the evidence. It is true that at the instance and request of plaintiff the defendants permitted a portion of the water above the Slaght

springs to flow to plaintiff's premises for a period of from two to four days; it also appears, however, from the testimony, that defendants thereafter refused to allow the water to flow down to plaintiff, claiming a right thereto adverse to plaintiff. In this respect, the finding ought to have been qualified so as to conform to the facts. Again, it was not necessary, as the finding states, " to confine and flow the same through the ditch of defendant Sabron, in order that the water might connect with the waters of the springs on the Slaght ranch."

We have, upon reviewing other findings, decided that the water, if left unobstructed and uninterrupted, would flow down to plaintiff's premises, but that its quantity would be diminished. The plaintiff requested defendant Sabron, when the defendants turned the water down, to let it run through his ditch instead of the natural channel, " because," says plaintiff, " the natural channel was dried up, there had been no water turned into it for some time, and it would take the water some time to get to my place through it." This was the fact, and it ought to have been so stated in the finding.

Is finding six sustained by the evidence ?.

The testimony shows that about the middle of June the plaintiff turned all the water down to his neighbors below. He says that " at that time their crops were suffering badly for want of water;" that his own crops " had just been irrigated once, but were suffering on the edges some," and that if he had had water sufficient after this, "his crops would have been good." The water used by Cook must be considered as having been used by the plaintiff. Cook was farming on the lower end of plaintiff's lower ranch, and had plenty of water to irrigate some thirteen acres of land leased from plaintiff; he used the water during the months of May, June, July and August, and at times when plaintiff needed the water on his own crops. When Cook leased this land plaintiff agreed to furnish him with water. Plaintiff had an undoubted right to furnish the water to his tenants, or to allow them to use it; but if by allowing them to use more

than was necessary to irrigate the leased land he was deprived of the water for his own use, he could not hold defendants responsible for any damages to his crops which were caused by allowing his tenants to use more water than was necessary to irrigate their lands; certainly not, if defendants allowed the quantity of water to which he had a prior right to flow down to his premises. The water used by English must also be considered as having been used by the plaintiff. English testifies that he used water in 1873, on Sabron's ranch, without permission of any one— "when it came down I took it." It seems that plaintiff claimed the land which English cultivated, and knew that he was using the water when it came down and never objected to it; in fact, English testifies that plaintiff told him he could have the water. The plaintiff not only allowed Cook and English to have a very liberal supply of water (more, in our judgment, than appears from the testimony to have been necessary to irrigate their lands), but allowed the water to run down to his neighbors below him at times when his own crops needed irrigation. It is difficult to determine from the record the exact amount of water that was allowed by plaintiff to pass his premises. Lemmon testifies that on the 15th of June he was at plaintiff's ranch and saw water running in the creek past plaintiff's premises. "I am positive," says witness, "there was three hundred inches; think there was five hundred inches." On the 6th of July, Lemmon was at plaintiff's ranch, and he testifies that at that time a portion of the water run in the creek-bed and a portion in a ditch; that he could not say whether plaintiff was using this water, as he did not go below the house, but plaintiff told him "the water was going below McKenzie." Again, about the first of August, Lemmon had another conversation with plaintiff about the water. Lemmon asked him if he got the water, and he said in reply that "he got all he wanted." Boyd testifies that he was at plaintiff's ranch twice, about the last days of June, and "that there was a large body of water running down the creek both times." He describes its bulk at three or

four feet wide and two inches deep, with a swift current. Plaintiff commenced harvesting his crops of grain on the 21st day of July, and finished in the early part of August. It is shown that he raised a better crop than defendant Sabron, who at all times had plenty of water.

In the application of this testimony to the question under consideration it must be borne constantly in mind that the defendants turned down the water and allowed it to flow to plaintiff at or about the time plaintiff allowed it to run to waste. In this connection must also be considered the declarations of plaintiff as to the condition of his crops and the amount of water needed to irrigate the same. Sabron testifies that a short time after the 4th of July, 1873, he was at plaintiff's lower ranch; that plaintiff "complained of not having plenty of water," and said to witness, "If you will let me have water for the wheat I can get along; * * * the upper ranch is all right;" and that the defendants let him have water to irrigate his wheat. McCullough testifies that between the 4th and 15th of July, he was on plaintiff's ranch; that plaintiff then said that if defendants would let him have water four days he could save his wheat; that he did not want any more water on the Slaght place—it was safe. "We agreed to let him have water and he got water."

If plaintiff did not require the full amount of his appropriation, he could not hold the defendants responsible in damages for not turning it down to him; he was only entitled to as much water—within his original appropriation—as was necessary to irrigate his land, and was bound, under the law, to make a reasonable use of it. In a dry and arid country like Nevada, where the rains are insufficient to moisten the earth, and irrigation becomes necessary for the successful raising of crops, the rights of prior appropriators must be confined to a reasonable and necessary use. The agricultural resources of the State cannot be developed and our valley-lands cannot be cultivated without the use of water from the streams, to cause the earth to bring forth its precious fruits. No person can by virtue of

a prior appropriation claim or hold any more water than is necessary for the purpose of the appropriation. Reason is the life of the law, and it would be unreasonable and unjust for any person to appropriate all the waters of a creek when it was not necessary to use the same for the purposes of his appropriation. The law which recognizes the vested rights of prior appropriators has always confined such rights within reasonable limits. "We say within reasonable limits," with the court in *Basey* v. *Gallagher*, "for this right to water, like the right by prior occupancy to mining ground, * * * is not unrestricted. It must be exercised with reference to the general condition of the country and the necessities of the people, and not so as to deprive a whole neighborhood or community of its use and vest an absolute monopoly in a single individual." What is a reasonable use depends upon the peculiar circumstances of each particular case. In this case plaintiff should not be confined to the amount of water used by him in 1869 or 1870, nor his rights regulated by the number of acres he then cultivated. He did not cultivate more land, because "his team was poor" and he "had no money to hire help." The object had in view at the time of his diversion of the water must be considered in connection with the actual extent of his appropriation. If the capacity of his ditches is greater than is necessary to irrigate his farming land, he must be restricted to the quantity needed for the purposes of irrigation, for watering his stock and for domestic purposes. If, however, the capacity of his ditches is not more than sufficient for those purposes, then, under all the facts of this case, no change having been made in either of plaintiff's ditches since they were constructed, and no question of the right of enlargement being involved, he must be restricted to the capacity of his ditches at their smallest point; that is, at the point where the least water can be carried through them. (*Ophir S. M. Co.* v. *Carpenter et al.*, 6 Nev. 393.)

If defendants could save any water by turning it around the bar on Sabron's land and thereby procure a greater quantity for their own use, they have a right so to do.

Moreover, as it is shown by plaintiff's' testimony that it is only necessary to irrigate his lands three or four times during the season, usually from ten to fifteen days apart, the defendants can only be required to turn the water down to him at those periods.

We think the rule is well settled, upon reason and authority, that if the first appropriator only appropriates a part of the waters of a stream for a certain period of time, any other person, or persons, may not only appropriate a part, or the whole of the residue and acquire a right thereto, as perfect as the first appropriator, but may also acquire a right to the quantity of water used by the first appropriator at such times as not needed or used by him. In other words, if plaintiff only appropriated the water during certain days in the week, or during a certain number of days in a month, then the defendants would be entitled to its use in the other days of the week, or the other days in the month.

The Supreme Court of California, in *Smith* v. *O'Hara*, have announced what appears to us to be the correct doctrine. "It is usually the case," says the court, "that the amount of water to which the several persons claiming its use are entitled, is measured by inches, according to miners' measurement, or by the capacity of the ditches through which it is conducted from the stream,' but there is no reason why the amount may not be measured in some other mode. They hold the amount appropriated by them respectively as they would do had the paramount proprietor granted to each the amount by him appropriated. The right to use the waters, or a certain portion of them, might be granted to one person for certain months, days, or parts of days, and to other persons for other specified times. An agriculturist might appropriate the waters of a stream for irrigation during the dry season, and a miner might appropriate them for his purposes during the remainder of the year. And so may several persons appropriate the waters for use during any different periods. There is no difference in principle between appropriations of waters measured by time and those measured by volume." (43 Cal. 376.)

Upon a careful review of the evidence, we are of opinion that plaintiff was negligent in allowing his tenants to use more water than was necessary to irrigate their crops, and also in allowing the water which defendants turned down to him to run to waste when his own crops needed irrigation. By these acts we think he caused the damages which, he claims, resulted from his failure to procure a full crop for want of irrigation. We think, although the testimony is not clear, and many of the findings of the court are unsatisfactory and some of them contradictory, that there is a substantial conflict in the evidence to warrant the conclusion reached by the court that plaintiff contributed to his own damage. In entertaining this view of the case, we must not be understood as deciding that defendants were wholly without fault. It is the immediate consequences of the injurious acts that must be regarded in assessing damages, and even if defendants were to some extent in fault (and we think they were) they still had the right to show that the injury of which plaintiff complained was the immediate result of his own negligence, and was not in any way attributable to any act of theirs. Does this finding, however, support the judgment? We think not.

It does not necessarily follow from the language used that plaintiff could not recover. The principles that control this case are not, as counsel assume, analogous to the rules applied in actions brought to recover damages on the ground of defendants' negligence, wherein such a finding sustains the judgment for costs, in favor of defendants, upon the theory that both parties were at fault in producing the injury complained of, and that the plaintiff in the action so contributed to his own damages as to render it impossible for the court to apportion the damages, or to exactly ascertain how much each party contributed. In such actions the rule of contributory negligence is applied to prevent any recovery by either party. In sustaining the finding we must not be understood as holding that because plaintiff was at fault in allowing the water to run to waste, that his negligence in this respect would authorize or justify the de-

fendants in thereafter withholding from him the amount of water to which he was legally entitled. It was the duty of the defendants every fifteen days, or thereabouts, as plaintiff might need the water, to turn down a sufficient quantity, within plaintiff's appropriation, required to irrigate his lands, provided always, that he was not by other means supplied with sufficient water for that purpose; and if they did not do so, or if plaintiff did not, on account of their wrongful acts, get all the water within his appropriation that was necessary for the irrigation of his crops, then, notwithstanding his own previous negligence, he would be entitled to recover at least nominal damages and costs, with a decree for equitable relief. There is another reason why the judgment cannot be sustained upon this finding. Defendants, in their pleadings, deny that plaintiff is entitled to any of the waters of Currant Creek except the waters flowing from the springs situate upon the Slaght ranch, below the lands owned by defendants, and assert an adverse right to all the waters flowing in said creek above said springs. The evidence shows that when defendants allowed the water above said springs to flow down to plaintiff's premises it was as a favor to plaintiff; that when they afterwards refused they based their refusal upon the ground that they had a better right to the use of the water. This was, in our judgment, such a diversion as by lapse of time might ripen into a prescriptive right; and although plaintiff's crops of grain and vegetables were not actually damaged by the acts of defendants, it was, nevertheless, an injury to plaintiff's rights and entitled him to recover nominal damages, and to an equitable decree declaring the amount of water to which he is entitled.

The rule of law is, that in cases for the diversion of water, where there is a clear violation of a right and equitable relief is prayed for, it is not necessary to show actual damage; every violation of a right imports damage; and this principle is applied whenever the act done is of such a nature as that by its repetition or continuance it may become the foundation of an adverse right. (*Parker* v. *Gris-*

*wold*, 17 Conn. 288; *Webb* v. *The Portland Manufacturing Company*, 3 Sumner C. C. 189; *Blanchard et al.* v. *Baker et al.*, 8 Greenleaf (Me.) 253; *Stein* v. *Burden*, 24 Ala. 130.)

The findings of fact by the court are like a special verdict of a jury, and must be taken in connection with the pleadings to support the judgment. (*Swift* v. *Muybridge*, 8 Cal. 445; *Reynolds* v. *Harris*, 8 Cal. 617.) They cannot be detached from each other, but must be read together for the purpose of ascertaining their meaning (*Millard* v. *Hathaway*, 27 Cal. 140; *Kimball* v. *Lohmas*, 31 Cal. 156); and if there is any conflict or discrepancy between general and specific findings the specific findings must control. (*Hidden* v. *Jordan*, 28 Cal. 302.) Applying these principles to the case under consideration it becomes at once apparent that the judgment rendered by the court was based upon the specific findings that support the pleadings of defendant, which allege that plaintiff's rights are confined to the water flowing from the springs on the Slaght ranch, and for this reason upon the merits of the case we are satisfied that the judgment ought to be reversed.

The preliminary objections urged by respondents' counsel are not, in our judgment, well taken. We think the court below was authorized, upon the application for a new trial under the specifications in the sixth subdivision of section 195 of the Practice Act (Stat. 1869, 226), to decide whether the findings sustained the judgment, and that its action in regard thereto can properly be reviewed by this Court on an appeal from the order overruling plaintiff's motion for a new trial.

The judgment and order appealed from are reversed and cause remanded for a new trial.

BEATTY, J., concurring:

In this case I concur in the judgment of the court upon the following grounds:

The defendants, by their answers, admit and justify the diversion of the waters of Currant Creek above the Slaght Springs, asserting that they did not naturally flow down to

that point in the bed of the stream, and consequently that plaintiff could have made no appropriation of any waters except those of the springs. They claim for themselves a prior appropriation of all the waters of the creek flowing above the springs. Such being the defense set up, if the plaintiff could prove that the waters of Currant Creek did naturally flow down to his premises, that he made an appropriation of the whole or any part of the water flowing from above the Slaght Springs prior to any appropriation by the defendants, and that they afterwards diverted the whole of the water above the springs at times when he needed it, and by virtue of his appropriation was entitled to it,—upon such a showing the court should at least have decreed the amount of water that he had first appropriated, enjoined the defendants from any future diversion of so much water, and given him a judgment for his costs, and that whether he proved any specific amount of damages capable of being exactly assessed or not. But the court, among other findings upon which it bases the judgment against the plaintiff for costs, finds that he contributed to his own damage by not making use of all the water that he might have used. That is to say, the court holds, that if a man is deprived of three-fourths of the water he is entitled to by the wrongful act of another, he can obtain no relief, legal or equitable, if he has allowed any portion of the remaining fourth to run to waste, because he has thereby contributed to his own damage. It is scarcely necessary to say that the doctrine of contributory negligence has no application to such a case, and consequently that the finding in question is wholly immaterial.

The judgment must, therefore, be sustained upon the other findings if sustained at all. In all the balance of the findings there is but one material fact asserted, and that is, in effect, that Currant Creek does not naturally flow down to plaintiff's premises, but sinks above the Slaght Springs; all the rest is merely argument to prove this fact or deduction from it, and the finding is opposed to all the testimony in the case. It is, moreover, inconsistent with the

other finding, that plaintiff contributed to his own damage; for to say that plaintiff *contributed* implies that the defendants also contributed, and they could only contribute by diverting water which would have flowed down to plaintiff except for their diversion. The motion for a new trial should have been allowed.