LOUIS CANEPA AND EVA CANEPA, HIS WIFE, AND WILLIAM CANEPA AND ESTHER CANEPA, HIS WIFE, APPELLANTS, v. F. E. DURHAM, SOMETIMES KNOWN AS FRANK DURHAM, AND CORA E. DURHAM, RESPONDENTS.

No. 3517

October 11, 1948.                    198 P.2d 290.

Withers, Sanford & Horgan, of Reno, for Appellants.

Clyde D. Souter and Clel Georgetta, both of Reno, for Respondents.

## OPINION

By the Court, BADT, J.:

Defendants have appealed to this court from the judgment of the district court canceling a deed theretofore executed by the plaintiffs in favor of the defendants and settling the accounts of the parties growing out of the canceled transaction, and have also appealed from the order of the district court denying defendant's motion for a new trial. The trial of the case was the second trial of the action—the judgment rendered in favor of plaintiffs in the first trial having been reversed by this court. Canepa v. Durham, 62 Nev. 417, 153 P.2d 899. Petition for rehearing of the first appeal was denied. 62 Nev. 429, 155 P.2d 1009. When petitioning for a rehearing on the first appeal the respondents asked that in the event the petition for rehearing was denied the case be remanded to the lower court for further

action and proceedings under sec. 9385.78, N.C.L., 1931–1941 Supp. This petition was likewise denied. 62 Nev. 429, 155 P.2d 788. Defendants also appealed from the clerk's order taxing costs, and this court sustained the ruling of the clerk. 62 Nev. 429, 155 P.2d 788. The appellants filed a further petition for rehearing, which was likewise denied by this court. 62 Nev. 432, 155 P.2d 1009. The first decision of this court on the first appeal (62 Nev. 417, 153 P.2d 899, 904) contained the order: "The judgment and order appealed from are reversed." Plaintiffs were thereupon granted a new trial by the district court. Appellants contended that the order of reversal finally disposed of the case and that the lower court was thereafter without authority to grant a new trial and appealed from such order, but this court affirmed the district court's order granting such new trial. Canepa v. Durham, 63 Nev. 245, 166 P.2d 810. As noted, plaintiffs again prevailed in the second trial, and defendants have again appealed. The first opinion of this court held in effect that certain essential proofs were so lacking that the findings and judgment could not be sustained. The present appeal is concerned largely with the question as to whether such lack of proof was met and overcome in the second trial to such extent to justify the court's second findings and judgment in favor of plaintiffs.

The record now before us contains all of the evidence adduced at the second trial as well as the evidence adduced at the first trial, made a part of the record before the district court by stipulation and which is also part of the record before this court. Subject to certain changes and additions by reason of the new evidence adduced at the second trial, a recital of part of the facts as made by ORR, C. J., speaking for the court on the first appeal, may be resorted to. Although this unfortunately will result in greatly lengthening this statement of facts, it will obviate the necessity for searching two volumes of Reports to obtain the same. Judge ORR'S

statement of the facts in the first trial (62 Nev. 418–423, 153 P.2d 899) is as follows:

"Respondents, Frank E. Durham and Cora Durham, in the spring of 1936, entered into an agreement to sell to appellants, Louis and Eva Canepa and William and Esther Canepa, certain real property, consisting of approximately 382 acres, situate about nine miles west of Reno, on the Verdi Highway. Contemporaneously with said agreement, the Durhams executed and delivered to the Canepas a deed conveying said land and water rights. At the time of the sale the Federal Land Bank of Berkeley, California, held trust deeds on the property as security for an indebtedness in the sum of $17,019.31; also, at the same time, the respondents were indebted to the United States of America through one of its crop loan agencies for money borrowed to purchase seed, which was secured by a chattel mortgage on certain hay located in a barn situate on said ranch. The agreement provided that the Durhams reserve about twelve acres, which the Canepas agreed to have released from the trust deeds hereinbefore referred to. The partial release was to be obtained by the appellants and delivered to the respondents on or before the 1st day of January, 1940, provided that in the meantime respondents had saved the appellants harmless from the chattel crop mortgage. Said agreement further provided that appellants pay interest and payments as provided in the trust deeds to the Federal Land Bank of Berkeley, California. Respondents agreed to pay general taxes assessed against the twelve acres after January 1, 1936, and to pay their portion of ditch maintenance, and also Coldron Ditch assessments for water right reserved to said twelve acres. Appellants executed and delivered to respondents as part of the consideration two notes, one in the sum of $250, payable on or before November 1, 1936, and one in the sum of $225, payable on or before November 1, 1937. It was orally agreed between the parties that the hay located upon the ranch property and

covered by the chattel mortgage was to be left in the barn for a reasonable period of time. The hay remained in the barn from April 9, 1937, to March 10, 1939, a period of twenty-three months. Appellants failed to pay the principal or interest on the two notes above mentioned and failed to secure from the Federal Land Bank of Berkeley, California, a release from the two deeds of trust of the portion of the ranch reserved by respondents. Respondents, in the year 1939 and before the expiration of the time fixed in said agreement to secure the release of the twelve acres, sold said twelve acres to one Belz.[1] Appellants have made the payments required to be made to the Federal Land Bank of Berkeley, California, under said trust deeds, each year, and the amount paid by them, together with two checks given by the Highway Department of the State of Nevada to said bank for certain rights of way, in the sum of $11,709.57. The actual amount paid by the Capenas is $9,092.37; this includes $2,100 paid at the time of the consummation of the deal. The indebtedness to said bank has been reduced from $17,019.31 to $8,558.15.[2] Because of the failure of appellants to obtain the partial release and to pay the notes when due, respondents, on the 23d day of January, 1942, addressed the following letter to the appellants:

" 'Verdi, Nevada, Jan. 23rd, 1942 .
Louis Canepa and William Canepa,
Verdi Highway
Washoe County, Nevada.
Gentlemen:

You entered into a contract with us on April 9, 1936, and agreed to secure a partial release from the mortgage

[1] They quitclaimed it to Belz on the latter's insistence that something be done to take care of his unsecured advances aggregating $3,500, and agreed that it would be released from the Federal Land Bank mortgage before January 1, 1940. (Findings, second trial.)

[2] This has since been paid in full.

held by the Federal Land Bank of Berkeley, California, on about twelve (12) acres of land which we reserved from the sale of our ranch to you.

You agreed to obtain the release and deliver it to us on or before January 1, 1940.

This you have failed to do now for a period of two years. We think this is more than a liberal time, and therefore we notify you that unless within sixty days you complete your contract by delivering it to us, we shall consider that you have abandoned your contract and take action against you.

Very truly yours,

Frank E. Durham

Cora E. Durham'

"Under the date of January 31, 1942, the appellants answered as follows:

" 'January 31, 1942

Frank E. Durham, and Cora E. Durham,

Verdi, Nevada.

Dear Mr. and Mrs. Durham:

We acknowledge receipt of your letter of January 23d in which you demand partial release of some twelve acres of land pursuant to agreement signed between us on the 8th day of April, 1936, stating that unless this release is furnished you, you will consider that we have abandoned our contract and will take action against us.

May we call your attention to the wording of the agreement referred to, as follows: "Said partial release to be obtained and delivered to the parties of the first part on or before January 1st, 1940, *providing in the meantime parties of the first part have saved the parties of the second part harmless from chattel crop mortgage dated April 2nd, 1935, filed under No. 304, in the file of Chattel mortgages, records of Washoe County, Nevada.*"

You will recall that the Government filed a suit against you and against us for the foreclosure of this mortgage, as a result of which we were put to considerable costs

and expense in the way of attorney fees. It is our contention that you have not saved us harmless from the crop mortgage and until such time as you do, you are not entitled to your release.

Furthermore, we are being billed for delinquent water assessment charges as follows:

| | |
|---|---|
| Part right No. 94 in Coldron Ditch, | |
| 1934 assessment, delinquent | $18.36 |
| Part right No. 94 in Coldron Ditch, | |
| 1935 assessment, 2nd, delinquent | 6.20 |
| Part right No. 94 in Coldron Ditch, | |
| 1935 assessment, 1st, delinquent | 12.40 |

These charges were due and payable by you prior to the time that we entered into our agreement with you, and should be paid by you.

It is unfortunate that in our dealings with you we have had so many arguments and disagreements. We realize that legal action will result in both of us incurring heavy expenses and that, in the long run, we will both suffer by such action. We therefore submit to you the following offer to compromise all disputes between us:

1. That we apply for, and give our consent to, the release demanded by you.

2. That you pay us the water assessments mentioned.

3. That we give you, and you in turn give us, a release wherein each of us releases the other from any and all claims of every nature whatsoever.

4. That you make application to the Federal Land Bank of Berkeley, requesting that you and Mrs. Durham be relieved from liability on both the Land Bank and the Land Bank Commissioner loans, No. 22449 and A3983.

We will be glad to proceed along these lines at any time. We do not feel, however, that we should be called upon to give you this release until all possible argu-

ments between us have been straightened out and adjusted for all time.

Very truly yours,

L. Canepa<br>W. Canepa'

"Thereafter respondents, on the 4th day of March, 1942, again addressed a letter to appellants, reading as follows:

" 'Louis Canepa and William Canepa, Verdi Highway, Washoe County, Nevada.

Gentlemen:

This will acknowledge your letter of January 31, 1942.

You base your failure to comply with your contract with me and Mrs. Durham upon the fact that you state that you expended counsel fees in connection with the action which the United States Government instituted against me, and to which you were made a party because you testified you had purchased a part of the hay covered by the Federal Chattel Mortgage from me, but admitted that you had never paid for it. Had you paid for the hay, which you yourself stated under oath you had received from me, you would never have been involved in that action.

As a matter of fact, both you and we know that the hay was never sold to you by us, but that you took it out of the barn without any authority, after having it fully explained to you, before the ranch was sold to you, that the hay was covered by a Federal Chattel Mortgage, and that it was not a part of what you bought.

Any counsel fees that you expended, or anything else you have paid in that connection, was because of your own transgression, and in my opinion it is no excuse whatever for your failure to carry out your contract.

I wish to repeat to you that unless within the time fixed by my first letter, of January 23, 1942, you comply

with your contract, I shall consider that you have abandoned it.

Yours truly,

Frank E. Durham<br>Cora E. Durham'

"On August 7, 1942, respondents instituted an action in the district court asking a rescission of the contract and a cancellation of the deed.  * * *  On April 30, 1942, and prior to the commencement of this action, appellants applied to the Federal Farm Loan Bank for the partial release provided for in the agreement of April 9, 1936. On the 13th day of August, 1942, appellants were advised by the National Farm Loan Association that the release could not be cleared because it was not signed by said Frank E. and Cora E. Durham.   The formal request signed by appellants was submitted to respondents for their signatures after the institution of this action."[3]

Both parties appear to agree that the former decision of this court fixes and establishes the law of the case as applied to the facts presented at the first trial.   The law of the case as thus established may accordingly be said to embrace, among others, the following points:

1. The action is one for an equitable rescission and not for a judgment declaring a forfeiture for any breach of the conditions of the contract.

2. If plaintiffs received the full value of the reserved acreage and have been permitted to enjoy the benefits of the consideration paid, without interference from the purchaser thereof, and if their sale of said land to Belz was in no way contingent upon the securing of the release by the defendants and if the agreement of the defendants to obtain the release was not of the essence of the contract and if plaintiffs did not sell said lands with the assurance to the purchaser, Belz, that they would be released from the lien of the deeds of trust on

---

[3]New evidence on this phase of the question was adduced at the second trial and is hereinafter referred to. Appellants' application for partial release was made a few days before August 13, 1942.

or before January 1, 1940 and if the Durhams received ample consideration for their land before the time for obtaining of the release had elapsed and were in no way embarrassed or harmed or damaged by reason of such failure and if the purchaser Belz was perfectly satisfied to let the matter ride along until the entire amount secured by the trust deeds was paid by defendants and the entire property thus automatically released and if plaintiffs wrongfully withheld their cooperation from the attempt of the defendants in good faith to obtain the release; then the equities of the case would not entitle them to a rescission.

3. The question of whether or not a rescission shall be granted rests largely in the sound discretion of the court.

4. A partial failure of performance of a contract will not give ground for its rescission unless it defeats the very object of the contract or renders that object impossible of attainment, or unless it concerns a matter of such prime importance that the contract would not have been made if default in that particular had been expected or contemplated.

5. The purpose of the present action is not to declare a forfeiture, but some of the reasons given by the authorities why a forfeiture should not be declared apply with equal force against the granting of a rescission.

6. The mere fact that a conveyance has been made does not prevent rescission and cancellation of the deed for failure of consideration. The courts, however, are reluctant to grant this relief even though there is a substantial or total breach of the return promise if any other compensatory relief is available.

7. If specific damage is proved by the plaintiffs, it is incumbent upon them to show why the same would not be adequate before they are entitled to the remedy of rescission.

8. A mere showing by the plaintiffs that it is impossible to ascertain the damages occasioned by the acts of the defendants would not entitle the plaintiffs to the

remedy of rescission if the facts indicate that no such damages resulted.

9. Ordinarily, an action to recover the amount due on a promissory note affords adequate relief from the promissor's breach of his obligation to pay.

10. This court must sustain a judgment of the trial court if the same is supported by substantial evidence in the record.

Appellants most earnestly contend that the situation presented to us on this present appeal is precisely the same as that presented on the first appeal and must result in a reversal as did the first appeal. Respondents, on the other hand, contend just as earnestly that the new evidence adduced at the second trial supplied all the elements that were lacking in the first trial and that the findings and judgment of the district court in a second trial are now amply sustained by substantial evidence. It remains for us to determine by a careful scrutiny of the record of the evidence adduced at the second trial, which contention is correct.

The following letter, not in evidence in the first trial, was admitted in evidence:

"August 13, 1942

Mr. William Canepa
Rt. 2 Box 204
Reno, Nevada

Loans 22449–A3983 L. & Wm. Canepa

Dear Mr. Canepa:

*The other day* when you called at the office, you left an application for partial release signed and asked me to hold it and that you would instruct me as to the time when we should submit it to the Bank. This release has not been signed by Frank E. and Cora E. Durham, therefore it will be impossible for me to submit it for clearance.

In addition to the lack of their signatures, *you have requested that I hold it.* Our regulations require us to *submit* these applications for releases upon completion,

therefore I am returning this application to you. . I am asking you to secure the names of Frank E. and Cora E. Durham and that *when you are ready to submit this release,* return it to this office and we will send it to the Bank.

> Yours very truly,
>> Roy G. Bankofier
>> Secretary-Treasurer"

(Emphasis supplied.)

The record indicates that plaintiffs did not know of the existence of this letter at the time of the first trial. Some attempt was made by defendants to show that the application for partial release therein referred to had actually been filed by the Canepas on April 30, 1942, the date of such application, but the trial court was amply justified in concluding that it had been filed only a few days prior to August 13, 1942. The letter from the Federal Farm Association of that date says that the application was left at the office, "the other day." The 1948 edition of Webster's New International Dictionary defines this expression as meaning: "A recent unspecified day; formerly, specif.: (1) the second or next day; (2) a day ago." The last preceding edition of Webster defined it as meaning "a day not long ago;— usually adverbial; as, I saw him the other day."

These definitions are indeed the usual connotations of the term. So we may take it that the application was returned to the Canepas within the course of a day or two or thereabouts after it was received and was returned for two reasons, first, because it did not have the signatures of the Durhams and, secondly, because it was against "our regulations" to hold it pending further instructions. It was actually not presented to the Durhams by the Canepas for the signatures of the former until September 19, 1942, after the commencement of the action. Mr. Chief Justice ORR when writing the former opinion, did not have all of these facts before him when he stressed the failure of the Durhams to

"cooperate" in applying for the partial release. It now appears that the "regulations" prevented compliance with the request of the Canepas that the loan association defer forwarding the application to the Land Bank pending further instructions. (Nor is it explained why, when the obtaining of the release was already two and one half years overdue, the loan association was requested to hold it indefinitely without action.) Apparently the same "regulations" made it "impossible" for the loan association to submit it to the Land Bank for clearance without the Durhams' signatures. The learned district judge in the second trial patently considered the signing of this application by the Durhams a mere matter of form,[4] and that the release of the twelve acres from the deeds of trust was the obligation of the Canepas, who would have to satisfy the Federal Land Bank, by sufficiently reducing the notes by January 1, 1940, that the bank had ample security without this small tract.

Further testimony adduced during the second trial included the following: Mr. Leo Schmitt, whose qualifications were admitted, testified in April 1947 that the rental value of the Canepa or Durham ranch was then 20 percent higher than when fixed as $1,800 a year in 1942.

With reference to the evidence lacking from the record of the first trial and without which a judgment for rescission was without support and particularly as referred to in several of the numbered paragraphs,

[4] The Federal Land Bank undoubtedly had some ostensibly good reason (if this seems grudgingly charitable, so be it) for a regulation making it "impossible" to release part of the land from its mortgages without the signatures of its original mortgagors. But in this case it had in advance given its blessing to the plan proposed by the Durhams and had before it (or would have had before it if the Canepas had pressed their application) the actual deed from the Durhams to the Canepas and the contract whereunder the Durhams had not merely consented to the obtaining of the release by the Canepas but, a fortiori, had bound the Canepas by solemn covenant to obtain the release.

supra, defining the law of the case as fixed by the first decision, we may note the following testimony. Carl L. Belz, the purchaser of the twelve-acre tract referred to in the former opinion, was not a witness at the first trial but testified in part as follows at the second trial— putting his testimony in narrative form:

"In 1932 the Durhams had a bad year—and he came to me and I let him have $1200. He had cattle on the place and he needed feed and he was short of hay. From that time on it got tougher and tougher and he came after some more money and I let him have up to $3500. I went to him and says, 'Frank, this thing is running pretty heavy on me here and I'd like to know where I am standing on this thing. At the time he sold the ranch he told me that he had had a loan from the Federal Land Bank and on this loan that he was to get title to twelve and some odd acres of ground down by the river, and he said that he would get title to that January 1, 1940. He says he has got some money coming on this transaction with the Canepas, and that he would improve the house. He wanted to live there, as it had been in the family for so long, that he wanted to live on them twelve acres, that he would fix up this house, and as soon as he got this money and I says, if you have—the place is going to wreck down there now, and I'd want to have some security better than that, what I have got. I will try to get this thing and go down there and live, and get this money and fix up the house,' and in place of that, why he couldn't get any money and he couldn't go ahead with the deal. So I had an understanding that when he got the money from the Canepas he was going to fix up the old house on this twelve or thirteen acres, that he was going to get title to on the first of January, 1940. He told me he had some hay in the barn he was going to sell, that he was going to sell that and use that money also to help fix up the place. Durham told me that he had a couple of notes. They were supposed

to pay him when he made the transaction, and that was the money he was going to put into the house for improvements, to live on. After November, 1936, I examined the house to determine whether any improvements were being made there. There was no improvements being made. I thereupon saw Durham. He told me he couldn't make those improvements on that, that Canepa hadn't paid him his money on those notes. This situation continued for some time after that. In 1939 I went over to Durham. The house was gone to wreck, and the property was going into weeds and willows and stuff, and I told Mr. Durham, I says, 'Something has got to be done and you have got to take care of me here some way and this has run along a long time.' I threatened him that I would have to start suit with him. He says, 'Well don't start suit on me now.' I says, 'If you don't'—I says, well, I will have to do something. He says, 'If you don't start suit, I will waive my limitation of time on it in the trial.' He says, 'I will wait a little longer. I want to get this title that you agreed to give me. You haven't delivered me a title or anything else. You have got to give me something to secure me for my money.' The situation continued after that, and I finally demanded that he do something, that he give me something and he says, 'I can't give you a clear title to it, but I will give you the best title I can give you subject to'—that when this here ground would be cleared up with the Federal Loan Bank, that he would give me a title to the property, that is to say, when the Federal Land Bank Loan was cleared off that property he would give me a title. I understood that was January 1, 1940, and upon that representation I took a deed to the property in payment of the obligation that Durham owed me. The title was not cleared January 1, 1940 and he could not deliver it to me. I think it was cleared four years afterwards, somewheres around in there. I don't know for sure when it was. During the time I had that property after January 1, 1940, I had several offers to sell

the property, and I told them the only kind of a deed that I could give them was a deed like I had. Well, they wouldn't take the property. They wouldn't take it, wouldn't even give me my money I had in it, out; so I had to keep it and do the best I could with it. The amount of the offers was lots more than what I was in in the property—lots more than $3500—several thousands of dollars, but I couldn't sell it; they would not take the title the way I had a title, so I had to just naturally do the best I could with it. I could have cut it up in acre tracts or two-acre tracts and sold them at a nice profit. The property is located on Highway 40, right on the turn. It is a very desirable spot and could also be used with a nice filling station on the corner, and it had nice trees in the rear where a man could put a nice auto court and trailer camp in there. All of those things were considered by me for the use of this property at one time or another. I couldn't do anything the way the title was. I couldn't get title to the property, as the agreement was to me. It is my intention to hold the Durhams for the loss that I suffered by their failure to deliver good title on January 1, 1940. We never talked about the damages, the full amount of damages that I would be entitled to. That will have to be done by arbitration, by appointing somebody to arbitrate it, or else I will have to start suit for damages. I intended to do that. He has waived his limitation of time in which I can figure I have a right to sue him."

None of this testimony was before the court at the first trial or in the record on the first appeal. We may say frankly that this witness' testimony was in our opinion greatly weakened by his cross examination, and much of his direct testimony above quoted was elicited by questions of the most leading and suggestive character. However, the weighing of these considerations is not within the province of this court.

Plaintiff Frank E. Durham testified at the second trial to his marriage to the granddaughter of Felix O'Neil

who got this place in 1851 or 1852, to the residence of the family on the property for many years and to his sentimental attachment to it and to his desire to reserve "the old home place" if possible if the Federal Land Bank foreclosed. He told of the bank's approval of his plan to sell the rest of the property to some one who would assume the mortgage and of his subsequently placing the property for sale with this in view. He described the necessity of getting payment on the two small Canepa notes to devote to repairs on the house and to release the hay from the crop mortgage so that he could sell the hay and devote the proceeds to the same purpose, and that these plans were frustrated by the failure of the Canepas to pay the notes. He then testified in part as follows: "I would not have sold my ranch under any other terms than those I had given to the Bee Hive Reality Company. That plan under which I authorized the Bee Hive Reality Company to find a purchaser was the very corner stone of my plan in regard to my saving the home. That was the idea. It was the very corner stone of the whole plan. The failure of the Canepas to pay the notes as agreed to carry out their contract just upset my plans and I had to live elsewhere. It had a sentimental value for me—it had been in the family about 85 years. My wife's grandfather was the first one to have it, then her father, and then I held it, that is, Bates was my father-in-law, and altogether it was in the family about 85 years, and I always figured that I would reserve that old home place, as we call it for my old home. I just like the place. I was there a good many years myself and I wanted to stay there. My wife was born there on that place. The reason I eventually sold it to Belz was I owed him some money and that is the only way I could get out of it. He wanted his money and I couldn't do any different, only deed it to him. He threatened to sue me and I agreed with him to waive the statute of limitations and not hold that against him if he sued me later. We couldn't agree on any exact amount I am indebted to

him, because I was unable to give him a good title to this property on January 1, 1940. I wouldn't know what it would be, what the damage might be, without it was arbitrated, or settled by court, something of that kind."

Mrs. Durham's testimony was largely along the same lines—that when they received the notice of foreclosure they left the same night at twelve o'clock in a blizzard to go to Oakland to see the Land Bank, to see if they could make the arrangements they planned. This was done and they came back and authorized the Bee Hive Company to make the sale—"to get somebody to take the mortgage over for the main part of the ranch and we reserve the small twelve acres and the house for our own, to be released. That reservation was very much of importance because it was the only place we had left for us to go in our old age and we were getting along in years and we had to have some place, and that was why we made the reservation. It was the very foundation of making a contract with the—"

■ Again we note that the testimony of these two witnesses was materially weakened by the cross examination. Nor does it carry the weight that would be accorded it if the witnesses had used the language ascribed to them in the place of affirmative answers to leading questions. But, as noted, this was a matter for the consideration of the trial judge. He had the Durhams before him as witnesses not only in this trial but in the first trial and we cannot substitute our judgment for his in the matter of the weight to be given this testimony.

The first opinion referred to the trial court's holding that plaintiffs were at fault in their failure to pay certain water assessments and their removal of the balance arm from the scales and to the fact that the trial court did not consider these items of sufficient importance to justify the default of the defendants. This

apparently was still the attitude of the court in the second trial and would appear to be justified by the insignificant nature of the two items. The total water assessments amounted to $36.96 and were subject to simple adjustment. The value of the balance arm for the scales appears to have been negligible. There was also sufficient evidence to justify the finding that the Durhams were not in default in their agreement to hold the Canepas harmless against the foreclosure of the chattel mortgage on the hay stored in the barn.

In his decision, comprising some 16 pages, the learned trial judge reviewed much of the testimony and then said:

"From the foregoing testimony, the Court takes the view that, because of the failure to remove lien of the loan, Mr. Belz suffered damages in a material and substantial degree, the amount of which is uncertain, and that the plaintiffs have been exposed, by the default of the Defendants, to the hazard of an action for such damages.

"The Defendants contend that, by virtue of the sale by the Plaintiffs to Belz, they voluntarily abandoned their plan to make the 12 acres their home in their declining years, thereby showing that Plaintiffs entertained no sentimental feeling toward that piece of land. The evidence shows that there was such a sentimental feeling, that the plan referred to was made by Plaintiffs, and that the plan was abandoned because of the pressing debt owed by them to Mr. Belz. * * *

"The fact that the Plaintiffs gave up their plan to occupy the place as a home, in order to pay their debt, does not detract from the fact that the reservation of the 12 acres from the sale to the Defendants, and the covenant of the Defendants to clear the same from the lien, was a matter of such prime importance that the contract would not have been made if default in that particular had been expected or contemplated. The refusal of the Defendants to fulfill their covenant was, as I view it, willful."

■ The court then concluded that the plaintiffs were entitled to the equitable remedy of rescission upon an equitable basis and found in detail the items for which defendants were entitled to credit. All of this was thereafter embodied in formal findings of fact and conclusions of law upon which the court's judgment and decree were entered. The main contention of appellants is that such findings are not supported by the new evidence and in this regard they particularly direct their attack to the trial court's finding No. VII, wherein the court found as follows:

"That the Plaintiffs intended, on the payment of the first note, in November, 1936, to pay off the crop mortgage, sell the hay and put the remainder of the money into repairs on the house on the 12 acres with the intention of living in it; and that they intended, on the payment of the second note, to use the money for further repairs on said house, with the expectation of living in it.

"That for the purpose of discharging their debt of $3,500.00 to Carl Belz, the Plaintiff were under the necessity of conveying the 12 acres to Belz, upon the representation and inducement that said 12 acres would be released from the lien of the Deeds of Trust held by the Federal Land Bank of Berkeley, California, on or before the first day of January, 1940.

"That because of the failure of the Defendants, Louis and William Canepa, to perform the requirements of the contract between Plaintiffs and said Canepas, the said lien of said Deeds of Trust was not removed on January 1st, 1940, and as a result Plaintiffs were unable to invest the said Carl Belz with a title to said 12 acres free and clear of the said lien as of January 1st, 1940, as a result of which said Belz lost a sale of said property at a substantial profit to himself and was further prevented from sub-dividing said acreage and selling the same at a substantial profit; that said Belz has threatened Plaintiffs since said time with a suit to recover damages from them for their failure to deliver a title free

and clear of said lien as of January 1st, 1940, and is still threatening suit, and has been induced not to institute said suit upon Plaintiffs' promise not to avail themselves of the Statute of Limitations; that it is impossible to determine the damage which the Plaintiffs will suffer in order to compensate the said Belz for the failure of the Plaintiffs to deliver title to said 12 acres clear of said lien as of January 1st, 1940.

"That since the instant action has been carried through the Supreme Court of the State of Nevada and returned to this Court for a new trial, the said Belz has conveyed said twelve acres, with a considerable loss of profit to him, the amount of which, however, can only be determined by a suit instituted by Belz against the Plaintiffs, as a result of which the damages owing from the Plaintiffs to said Belz are impossible of calculation in the instant action."

In finding No. VIII the court definitely found that the application by the defendants to the Federal Land Bank for release of the 12 acres from the mortgages was not made until after the commencement of this action and between August 7, 1942 and August 13, 1942, and was not submitted to the plaintiffs for their signatures until September 19, 1942. The court further found in finding No. V that plaintiffs' notice of January 23, 1942 to the defendants that defendants must within 60 days obtain the release of the land from the bank's mortgages, which release was then two years overdue under the terms of the original contract, was a reasonable requirement and resulted in making time of the essence of the contract, and that more than reasonable time elapsed between that date and the institution of this action on August 7, 1942. In finding No. VI the court found generally that the plaintiffs had performed. In finding No. IV the court found that the due dates of the two notes from defendants to plaintiffs were arranged to put the plaintiffs in funds to retire the chattel mortgage on the hay in the barn so that plaintiffs could sell the hay and devote

the proceeds to repairs on the home place, plaintiffs being given the right to store the hay in the barn. The court further found in finding No. XV that the failure of defendant to perform the several covenants of their contract "constitutes so substantial and fundamental breach of the contract that it defeated the objects of the plaintiffs in making the contract, and a breach going directly to the very root of the contract. * * * " Under finding No. XVIII the court found that these undertakings on the part of the defendants were "so essentially part of the contract that the failure of the defendants to perform destroyed such an indispensable part of what the parties intended that the contract would not have been made with that condition omitted." The court also found that the defendants' denial as well as their two affirmative defenses and their cross complaint were untrue, except as to the allegations of the sundry expenses and payments by the defendants hereafter referred to.

In the testimony of Belz and the Durhams, above quoted, is found substantial support of these findings. Much of the briefs and oral arguments of the appellants is in the nature of an attack upon the testimony of these witnesses, but under the unbroken rule of this court we cannot encroach upon the power of the district court to determine the weight and effect to be given to such evidence.

■ The additional evidence adduced likewise warranted the finding that the notice to perform given the defendants by plaintiffs was reasonable and made time of the essence. The reference to this element contained in the former opinion loses its force in light of this new evidence. 5 Williston on Contracts, 1937 Revised Ed., 4106; 13 C.J. 688, "Contracts," sec. 783, 17 C.J.S., Contracts, sec. 504 a(4), p. 1072; 1 Black on Rescission and Cancellation, 2d Ed., 614; Roberts v. Yaw, 62 Kan. 43, 61 P. 409; Bishop v. Barndt, 43 Cal.App. 149, 184 P. 901; Nuttall v. Holman, 110 Utah 375, 173 P.2d 1015.

The court found the equities to be in favor of the plaintiffs and against the defendants, adjudged a rescission, and ordered the respondents to reconvey the property to the plaintiffs. Nevertheless the learned trial judge exercised painstaking care to reimburse the defendants for every item of expenditure to which they were equitably entitled and which redounded to the benefit of the plaintiffs. Thus we find that defendants offered evidence as to the value of improvements installed by them upon the property, including house, barn, garage, fences, ditches, headgates, out-buildings, removal of rocks, leveling, water system, pump house, telephone, scales, etc. These items as claimed by defendants aggregated $10,320, and the trial court allowed defendants $10,000 for the aggregate, as the extent to which the vendible value of the property had been increased by these improvements. To these the court added an additional $6,500 for the construction of a milk barn and other improvements made by the defendants after the institution of the action. They were also credited with all sums actually paid by them under the contract, including all mortgage payments to the Federal Land Bank, aggregating $18,735.04, but not including the sums of $2,200 and $417.20 paid by the State of Nevada for rights of way across the land and which were paid by the state directly to the bank and credited upon the notes. Defendants were also credited with the minor item of $36.96 water assessments which were chargeable against the plaintiffs. They were also credited with $230 for rental of the barn in which the plaintiffs continued to store their hay after the lapse of one year permitted them without charge under the court's proper construction of the oral contract covering this item. As correlative items defendants were credited with $3,609.30 for taxes paid by them, but charged with rental at $1,800 a year to the end of 1942 and at an increase of 20 percent commencing January 1, 1943. This was done in the court's reliance upon the testimony

of Mr. Leo Schmitt. The court also ordered plaintiffs to cancel and deliver up to defendants the two promissory notes executed by defendants in favor of plaintiffs in the aggregate sum of $450. There is substantial evidence to support each item of credit and debt and to support any rejection of further items of debt or credit claimed by the respective parties.

The court further ordered that "for the purpose of providing the necessary mechanics" for the delivery of the deeds, etc. by defendants and the payment of the required sum of money by plaintiffs, the deliveries be made by the respective parties to the clerk of the court within thirty days from the date of the judgment—rental payments being computed up to the date of the delivery of the deed to the clerk. This provides a simple and effective method of carrying the judgment into effect.

The judgment and order denying defendant's motion for new trial are affirmed with costs.

EATHER, C. J., and HORSEY, J., concur.

ON PETITION FOR REHEARING

January 28, 1949.                     202 P.2d 286.

For former opinion see 65 Nev. 428, 198 P.2d 290.

*Withers, Sanford & Horgan,* of Reno, for Appellants.

*Clyde D. Souter* and *Clel Georgetta,* both of Reno, for Respondents.

# OPINION

By the Court, BADT, J.:

Appellants have filed a petition for rehearing in which they emphasize the fact that in our former opinion we expressed the view that the testimony, both of Belz and the Durhams, was much weakened by the cross examination and by the very leading and suggestive form of the questions by which the testimony was elicited. Appellants' petition for rehearing urges that the testimony of these witnesses is not entitled to credence and supplies no substantial evidence in support of the trial court's findings. Numerous opinions of this court have expressed the view that this court would or might have found differently on the facts had it been the trier of such facts, but felt itself bound by the well-recognized rule that it would not intrude upon the province of the trial court in this respect. In Torp v. Clemons, 37 Nev. 474, 477, 142 P. 1115, 1116, the trial court had found that a trust existed by virtue of a deposit of certain shares of stock. McCarran, J., in an opinion concurred in by the other justices, and in which petition for rehearing was denied without opinion, said: "The testimony, as it is presented in the record, falls far short of binding conviction to our mind as to the existence of a trust between Clemons and Overton, but as there is a substantial conflict in the testimony, and there is some substantial evidence in support of the finding of a trust, the conclusion of the trial court in this respect, in view of the long-established rule of this court, will not be disturbed." Paraphrasing the language there used, we may indeed say that the testimony in the instant case, as it is presented in the record, falls far short of binding conviction to our mind of the existence of the facts which the former opinion of this court, 62 Nev. 417, 153 P.2d 899, 155 P.2d 788, written by Mr. Justice ORR held to be necessary to a recovery by the plaintiffs, respondents herein, but as there is substantial

conflict in the testimony and there is some substantial evidence in support of the findings, the conclusion of the trial court in this respect, in view of the long-established rule of this court, will not be disturbed. If by our adherence to this rule, "a hideous and cruel wrong will be perpetrated," as asserted by appellants, such wrong grows out of the facts that the trial court believed the testimony of witnesses asserted by appellants to be unworthy of belief. Had the trial court refused to believe the testimony of these witnesses (and the standing and experience of appellant's attorneys through this protracted litigation consuming six years permit us to assume that their arguments attacking their credibility were earnestly and efficiently presented to the trial court) appellants would with entire propriety have insisted upon this same rule by which we are bound.

The petition for rehearing quotes at length from the opinion of Mr. Justice ORR on the former appeal and insists that we have deviated from the law of the case as there established. In this regard, however, appellants fall into precisely the same error as the one in which they attack the testimony of Belz and the Durhams. They ignore the additional evidence adduced at the second trial or simply characterize such additional evidence as unsubstantial. We are satisfied that the testimony of respondent Durham and his wife and the witness Belz constituted substantial evidence. The credence to be given to this testimony was a matter to be determined entirely by the trial court.

Rehearing denied.

HORSEY, C. J., concurs.

EATHER, J. (dissenting).

Although I concurred in the opinion filed herein, a review of the facts prompted by a petition for rehearing leads me to the conclusion that a rehearing should be granted.

While this court may not usurp the functions of a

lower court in determining the weight and credibility to be given witnesses on their testimony, yet we may not close our eyes to indices which to a great extent disclose that testimony is ventriloquial in character.

It is elementary that if the lower court's findings are not supported by substantial evidence they cannot be sustained.

In the decision filed by this court on the 11th day of October, 1948, it is stated [198 P.2d 290, 297]: "We may say frankly that this witness' testimony (referring to the testimony of Carl L. Belz) was in our opinion greatly weakened by his cross examination, and much of his direct testimony above quoted was elicited by questions of the most leading and suggestive character. However, the weighing of these considerations is not within the province of this court."

Again in referring to the testimony of Mr. and Mrs. Frank E. Durham, the respondents in the above-entitled case, it is stated: "Again we note that the testimony of these two witnesses was materially weakened by the cross examination. Nor does it carry the weight that would be accorded it if the witnesses had used the language ascribed to them in the place of affirmative answers to leading questions. But, as noted, this was a matter for the consideration of the trial judge. He had the Durhams before him as witnesses not only in this trial but in the first trial and we cannot substitute our judgment for his in the matter of the weight to be given this testimony."

In commenting on these statements made in the opinion filed October 11, 1948, I wish to state that in the case of Canepa v. Durham, 62 Nev. 417, at page 425, 153 P.2d 899, 902, 155 P.2d 788, Judge ORR stated in his opinion as follows: "If we could say, after a consideration of all the evidence in the case, that there is substantial evidence in the record to sustain the said finding, then under the rule often announced by this court we would be required to sustain the judgment.

But after a careful consideration of the evidence we can reach no other conclusion than the Finding XXIX is without support as far as the evidence in this case is concerned."

In the case of Smith v. Goodin, 46 Nev. 229, 232, 206 P. 1067, 1068, this court held that:

"The question to be determined is, Is the evidence sufficient to justify the finding and decision of the court? It is said on behalf of the respondent that the evidence is conflicting, that there is substantial evidence to support the findings and decision of the court, and hence the judgment must, under a long line of decisions, be affirmed. The evidence is conflicting, and there is substantial evidence to support the judgment, and it is true it is a well-recognized rule in this state that when the evidence is conflicting and there is substantial evidence to sustain the judgment it will not be disturbed; but to this rule, as to nearly all well-established rules, there is an exception, as well recognized by this court as is the general rule, and as promptly and surely invoked and applied when applicable. We know of no better statement of the exception than is found in the language of the court in the case of Watt v. Nevada Central R. Co., 23 Nev. 154, 44 P. 423, 46 P. 52, 726, 62 Am.St. Rep. 772, where it is said:

" 'Notwithstanding, the well-established rule which has been so often announced by this and other courts that "where there is a substantial conflict in the evidence the appellate court will not disturb the decision of the court below," there is another rule as well established and of as binding force, both in actions at law and in equity, addressed to the conscience and judgment of the court of last resort, which cannot be ignored without doing violence to the plain principles of common justice in many cases, to wit: "If there be no substantial conflict in the evidence upon any material point and a verdict or decision be against such evidence upon such point, or where the verdict or decision strikes the mind, at first

blush, as manifestly and palpably contrary to the evidence, the Supreme Court will direct a new trial." Hayne, New Trial and Appeal, sec. 288 * * *, Barnes v. Sabron, 10 Nev. 217.' "

When we speak of substantial evidence we refer to something which has probative force. Evidence in "parrot fashion" by leading questions resolves itself into submitting to a court, indirectly by oath of a witness the data and information in the mind of the attorney. Such information thus received could scarcely be elevated to the dignity of a factual foundation and be characterized as substantial evidence.

For these reasons, I feel that a rehearing should be ordered in this case and that an order should be entered accordingly.